UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AIG EUROPE S.A., a/s/o Unilever United States, Inc., and Conopco, Inc. d/b/a Unilever, as assignees of the rights of C&S Wholesale Grocers, Inc., ACE American Insurance Company, A.E.D.S. LLC, and Northland Insurance Company; UNILEVER UNITED STATES, INC., as assignees of the rights of C&S Wholesale Grocers, Inc., ACE American Insurance Company, A.E.D.S. LLC, and Northland Insurance Company; CONOPCO, INC., as assignees of the rights of C&S Wholesale Grocers, Inc., ACE American Insurance Company, A.E.D.S. LLC, Northland Insurance Company, | 3:21-cv-01212-JFS<br><br>**AMENDED THIRD-PARTY COMPLAINT**<br><br>JURY TRIAL DEMANDED |
| Third-Party Plaintiffs, | |
| - v. - | |
| HARBOR FREIGHT TOOLS USA, INC. | |
| Defendant. | |

For their Amended Complaint filed as of right pursuant to Fed.R.Civ.P. 15(a)(1)(A), Third-Party Plaintiffs, Unilever United States, Inc. and Conopco, Inc. d/b/a Unilever (collectively "Unilever") and AIG Europe S.A. ("AIG"), by and through their undersigned attorneys, allege upon information and belief as follows:

INTRODUCTION

1. This action arises from a fire ("Fire") that broke out in between a tractor ("Tractor") and its accompanying trailer ("Trailer"), both of which were owned and operated by AEDS, LLC ("AEDS"), while the Tractor-Trailer was parked (a) in one lane of the multilane loading dock of U.S. Cold Storage's facility in Hazelton, Pennsylvania ("USCS Facility") and (b) adjacent to the Facility and its loading dock.

2. AEDS had been hired by C&S Wholesale Grocers, Inc. ("C&S") to (a) pick up 323 cases of "No Sugar Added" Fudgesicle 6-12 PK (valued at $12.36 per case), 283 cases of Rainbow

1

Popsicle 6-18 PK (valued at $17.58 per case), 1,170 cases of "Sugar Free" Orange, Cherry & Grape Popsicle 6-18 PK (valued at $17.58 per case), and 1,900 cases of "No Sugar Added" Fudgesicle 6-18 PK (valued at $17.58 per case) (collectively "Cargo"), which C&S had purchased from Unilever, and (b) transport said Cargo from the USCS Facility to C&S's facility in Westfield, Massachusetts ("C&S's Facility").

3. The Fire broke out while the Cargo was being loaded into the AEDS Trailer.

4. The Fire destroyed the Cargo and also spread to and destroyed other Unilever products staged on the loading dock, in store in the USCS Facility, and stowed in other trailers parked in the vicinity of the AEDS Tractor-Trailer (collectively "Products").

5. Unilever either owned those Products or was legally responsible for them at the time they were destroyed by the Fire.

6. Third Party Plaintiffs have settled their claim against AEDS and C&S.

7. As part of those settlements, for good and valuable consideration, AEDS and C&S and their respective insurers, Northland Insurance Company and ACE American Insurance Company, assigned their rights to all causes of action they have or had against Harbor Freight and any other third-party responsible for the Fire.

PARTIES

8. Unilever United States, Inc. was and is a Delaware corporation with an office for the transaction of business at 800 Sylvan Avenue, Englewood Cliffs, New Jersey 07632.

9. Conopco, Inc. d/b/a Unilever Conopco, Inc., was and is a New York corporation with an office for the transaction of business located at 800 Sylvan Avenue, Englewood Cliffs, New Jersey 07632.

10. Unilever United States, Inc. and Conopco, Inc. d/b/a Unilever are collectively referred to herein as "Unilever."

11. Unilever sold the Cargo to C&S but was never paid by C&S for the Cargo even though risk of loss had transferred to C&S at the time of the fire pursuant to the terms of a 5 August 2015 Customer Pick-Up Policy/Contract ("Pick-Up Contract") entered by Unilever and C&S.

12. Unilever owned or was legally responsible for the Products at the time of the Fire.

13. AIG was and is a Luxembourg corporation with an office for the transaction of business at Avenue J.F. Kennedy 35D, Luxembourg City, Luxembourg 1855.

14. AIG insured the Cargo and the Products, paid Unilever's losses resulting from the incident detailed herein, less Unilever's deductible, and is thereby subrogated to Unilever's rights to the extent of that payment.

15. Unilever and AIG bring this action on their own behalves and as agents or trustees on behalf of all having an interest in the Cargo and Products.

16. C&S was and is a Vermont corporation with an office for the transaction of business located at 7 Corporate Drive, Keene, New Hampshire 03431.

17. C&S purchased the Cargo from Unilever, had title to the Cargo and bore the risk of loss at the time of the fire, but failed to pay for the Cargo, despite due demand.

18. AEDS was and is a Connecticut company with an office for the transaction of business at 412 Barbour Street, Unit 3, Hartford, Connecticut 06120.

19. AEDS was and is registered with the United States Department of Transportation as an interstate carrier with U.S.D.O.T. number 1602422.

20. AEDS is the interstate motor carrier that was hired to transport the Cargo from Hazelton, Pennsylvania to Westfield, Massachusetts.

21. AEDS maintains shipping routes through the State of Pennsylvania.

22. AEDS owned and operated the Tractor-Trailer.

23. United States Cold Storage, LLC ("USCS") is a Pennsylvania corporation engaged in the business of warehousing and cold storage with its home office located at 15 Emery Street, Bethlehem, Pennsylvania 18018, and the warehouse in question located at 1102 N Park Drive, Hazleton, PA 18202.

24. Harbor Freight Tools USA, Inc. ("Harbor Freight"), at all relevant times, was incorporated in the state of Delaware, with its principal place of business in the State of California at 26541 Agoura Road, Calabasas, California 91302.

25. Unilever and AIG bring this action as assignees of the rights of AEDS and its insurer, Northland Insurance Company ("Northland"), with an office for the transaction of business at One Tower Square, Mail Code GS06, Hartford, Connecticut 06183.

26. Unilever and AIG bring this action as assignees of the rights of C&S and its insurer, ACE American Insurance Company ("ACE"), with an office for the transaction of business at 436 Walnut St, Philadelphia, PA 19106.

## JURISDICTION & VENUE

27. This Honorable Court has subject matter jurisdiction over Plaintiffs' original claims against AEDS and venue is proper pursuant to 49 U.S.C. § 14706(d) (the "Carmack Amendment") and 28 U.S.C. § 1331.

28. This Honorable Court has subject matter jurisdiction over Plaintiffs' original claims against C&S pursuant to 28 U.S.C. § 1332 because Plaintiffs and C&S are of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs.

29. Third-Party Plaintiffs, standing in the shoes of AEDS, C&S, and their respective insurers (as assignees of said Parties' rights), advance the claims asserted herein against Harbor Freight pursuant to Fed.R.Civ.P. 14(a)(1).

30. This Honorable Court has personal jurisdiction over Harbor Freight, and venue is proper pursuant to 28 U.S.C. § 1391(b)(2), because as a substantial part of the events or omissions giving rise to the claims discussed herein occurred within Luzerne County and in this District.

BACKGROUND

31. The Unilever-C&S Pick-Up Policy provides, in pertinent part, as follows:

**OBJECTIVE**

To provide a Customer with the opportunity to pick up their domestic U.S. order for over-the-road delivery only *without adversely affecting the Unilever operation, including the ability to deliver orders to other Customers efficiently*.

**POLICY**

Customers who wish to arrange a pickup from a designated Unilever facility are required to comply with the following policies & procedures:

**Equipment Specifications**

The Customer or, as applicable, the carrier, will be responsible for compliance with all Federal, State and local ordinances governing operation of motor carriers over streets, roads, and highways. Unilever will be responsible for loading all trailers pursuant to statutory requirements and reasonable industry practices. The following documentation must be available upon request for all . . . carrier(s):

\*    \*    \*

- Insurance that meets local, state, and federal laws governing transportation as relevant.

Liability for persons, property and damage must be a minimum of one million dollars.

- Trailers of . . . third-party carriers must meet Unilever Equipment Standards set forth below (hereinafter Specification). . . . The Customer or Customer's carrier must supply equipment in good condition and proper size to handle the tendered load. . . .

\*    \*    \*

**Title, Transfer, Overages, Shortages & Damage**

>Title, risk of damage to or loss of goods, and responsibility to file claims transfers from Unilever to the Customer at the time of pick-up, not to include claims relating to loading, unitization or packaging, the responsibility for which remains with Unilever. . . .
>
>\* \* \*
>
>**Indemnity**
>
>Each party shall defend, indemnify and hold harmless the other party and its officers, directors, employees and representatives from and against all loss, damage, expense, including reasonable attorney's fees, actions and claims:
>
>>a.   for . . . damage to property (excluding loss or damage to cargo) arising out of such party's negligent acts or omissions in connection with the loading, handling, transportation, unloading or delivery of any shipment hereunder, except to the extent caused by the other party's negligence, willful misconduct;
>>
>>\* \* \*
>>
>>c.   resulting from such party's failure to comply with or violation of any applicable laws or regulations, including but not limited . . . vehicle and . . . safety, except to the extent such failure results from acts or omissions of the other party;
>>
>>d.   for all other liability, loss and damage (excluding loss or damage to cargo) arising out of or resulting from such party's breach of this Agreement or failure to observe and enforce its duties and responsibilities hereunder, except to the extent caused by the other party's negligence or willful misconduct.

Pick-Up Contract, attached as Exhibit 1, pp. 1, 4, 6 (Emphasis added).

32.   In July 2019, Unilever agreed to sell, and C&S agreed to buy, the Cargo for $60,798.14 pursuant to Invoice No. 9841120062 and C&S agreed to pick up the Cargo from the USCS Facility pursuant to the terms of the Pick-Up Contract.

33.   Thereafter, C&S hired AEDS to pick up the Cargo at the USCS Facility and transport it to C&S's Facility.

34.   On 9 July 2019, AEDS, in consideration of certain agreed freight charges, arrived to pick up, receive, and accept the Cargo, then in good order and condition, at USCS's facility and

agreed to properly and adequately carry, keep, care for, discharge and deliver the Cargo to C&S's Facility.

35. Specifically, on 9 July 2019, AEDS's driver, James S. Augustus ("Augustus"), in the course and scope of his ownership, employment, and/or agency with AEDS drove a 1996 Freightliner tractor, bearing Connecticut registration 55773A, with an attached 2007 Utility refrigerated trailer from Hartford, Connecticut to Hazelton, Pennsylvania for the purpose of picking up the Cargo at USCS's Facility.

36. Upon arrival at USCS's Facility, Augustus backed the Tractor-Trailor into Loading Dock/Bay No. 36, whereupon loading of the Cargo into the Trailer was initiated.

37. Prior to 9 July 2019, AEDS installed or caused to be installed a gasoline-powered portable 3KW inverter generator (the "Generator") was attached to the Tractor's cab.

38. The Generator was a Harbor Freight Predator generator designed and/or sold by Harbor Freight.

39. The Owner's Manual and Safety Instructions for the Generator were copyrighted by "Harbor Freight Tools."

40. The Generator was attached to the Tractor's cab by Augustus.

41. The Generator was located at the rear of the Tractor's cab, between the cab and the Trailer.

42. That Generator was sold, distributed, and placed into the stream of commerce by Harbor Freight.

43. On day of the Fire, Augustus was sitting in the cab of his Truck, which was parked at the Premises' loading dock at dock number 36.

44. The Generator was running and "in use" at the time of the Fire.

45. On the date of the Fire, a plastic tote containing hoses, belts, and other miscellaneous items was mounted on top of the Generator.

46. Shortly after 3:18 p.m. on July 9, 2019, Augustus was alerted by a loud noise and discovered the Tractor was on fire.

47. Security video footage shows the Fire starting at about 3:18 p.m.

48. The video shows the Fire originating at the rear of the Tractor's cab, in the area between the cab and the Trailer, in the location of the Generator.

49. As of the date of the Fire, the owner/operator Augustus reported that there had been no known issues with the Tractor, Trailer, or refrigeration unit.

50. The Fire was caused when the excess heat created by the Generator ignited nearby combustible materials.

51. The Fire interrupted the loading of the Cargo and Products.

52. The Fire quickly spread from AEDS's Tractor to the Trailer, loading dock, to portions of the USCS Facility, and to additional trailers at adjacent loading docks.

53. Before the Fire, the Cargo and the Products were in good order and condition.

54. The Fire destroyed the Cargo and the Products.

55. Notwithstanding the fact that title to the Cargo and risk of loss had transferred to C&S at the time of the Fire pursuant to the Pick-Up Contract's *Title, Transfer, Overages, Shortages & Damage* Clause, C&S refused to pay for the Cargo, despite due demand.

56. Notwithstanding C&S's contractual obligation to "supply equipment in good condition . . . to handle the tendered load" (Pick-Up Contract, *Equipment Specification* Clause), the Tractor-Trailer were not in good condition as evidenced by the fact that the Fire ignited therein, without the fault of Unilever.

57. Notwithstanding C&S's contractual obligation to "pick up [its] domestic U.S. orders for over-the-road delivery only without adversely affecting the Unilever operation, including the ability to deliver orders to other Customers" (Pick-Up Contract, *Objective* Clause), C&S did adversely affect Unilever's operation, including its ability to deliver orders to other Customers, by hiring AEDS and AEDS's defective Tractor-Trailer.

58. As a result of the Fire's destruction of the Cargo and C&S's refusal to pay for the Cargo, Unilever suffered damages totaling $60,798.14, the invoice value of the Cargo.

59. As a result of the Fire's destruction of the Products, Unilever suffered losses totaling $170,325.86, as nearly as can now be determined.

60. Unilever submitted a claim to AIG for all of its losses sustained on account of the Fire, totaling $231,124, and AIG paid Unilever's losses, less Unilever's deductible, to settle said claim.

61. AIG thereby became subrogated Unilever's rights to the extent of that payment.

62. Unilever retains uninsured losses in the amount of its deductible.

63. On 22 November 2021, Third-Party Plaintiffs agreed to settle with C&S and its insurer, ACE.

64. As part of that settlement, and for good and valuable consideration, C&S and ACE assigned to Third-Party Plaintiffs all causes of action against Harbor Freight and any other responsible party.

65. On 30 November 2021, Plaintiffs agreed to settle with AEDS and its insurer, Northland.

66. As part of that settlement, and for good and valuable consideration, AEDS and Northland assigned to Third-Party Plaintiffs all causes of action against Harbor Freight and any other responsible party.

## FIRST CAUSE OF ACTION:
## INDEMNIFICATION

67. Paragraphs 1 through 65 are incorporated by reference as though fully set forth at length herein.

68. Harbor Freight, by and through its agents and/or employees acting within the course and scope of their agency and/or employment, designed, sold and/or distributed the Generator.

69. Harbor Freight was engaged in the business of designing, selling and/or distributing the Generator.

70. At the time the Generator left Harbor Freight's control, the Generator contained a defective condition which, upon normal use, was dangerous beyond the reasonable consumer's contemplation.

71. The Generator was sold to the end user in defective condition and was unreasonably dangerous to the end user, and this defect caused the Fire.

72. At the time the Generator left the control of Harbor Freight it contained one or more product defects in that the Generator did not include a temperature sensor, thermal cutoff, thermal cutout, or other safety feature to interrupt the engine, and did not include any audible or visual alarm to alert the user when the Generator overheated or caused excess heat.

73. The Generator was also defective in that it had the propensity to produce excess heat and to ignite nearby combustible materials.

74. These product defects caused the Generator to produce excess heat, fail, and ignite the Fire.

75. Harbor Freight failed to advertise the type and magnitude of the risk posed by the sale and use of the Generator.

76. Harbor Freight failed to warn the end user that the Generator did not have a thermal cutout or cutoff, and failed to warn the end user that the Generator created excess heat.

77. Harbor Freight failed to warn the end user that placing the Generator in a confined space or near plastic or other combustible materials could cause a fire.

78. Other sources, including OSHA materials, prescribe at least three feet of clearance on all sides of a generator.

79. Harbor Freight failed to warn the end user to keep all combustibles a safe distance away from the Generator, and/or the distance recommended by OSHA, to avoid a fire.

80. If the risk of using the Generator had been properly warned to the product user, the product user would have had the opportunity to comply with the warnings and avoid that risk, and the Fire would not have occurred.

81. At all times relevant, Harbor Freight owed duties to users and consumers of its products, as well as persons or entities who could foreseeably be injured by the use of its products by a user or consumer, including U.S. Cold Storage, as follows:

   a. to manufacture, design, sell, and distribute a Generator with a temperature sensor, thermal cutout, or other safety feature to interrupt the engine and/or warn the user when the Generator overheated or caused excess heat;

   b. to manufacture, design, sell, and distribute a Generator that would not overheat or cause a fire;

   c. to properly warn that the Generator was prone to overheating, cause excess heat, or cause a fire when used in confined spaces or near combustible materials;

   d. to properly warn that no combustible materials should be near the Generator while it was in use; and

   e. to otherwise ensure that the Generator would be reasonably safe to operate and would not create any dangerous conditions, foreseeable risks of harm, or unreasonably dangerous or unsafe or defective conditions, including causing a fire.

82. Notwithstanding the aforesaid duties, Harbor Freight, by and through its agents, owners, representatives, and employees, negligently, carelessly, and improperly committed the following acts and/or omissions:

   a. failed to manufacture, design, sell, and distribute a Generator with a temperature

      sensor, the1mal cutout, or other safety feature to interrupt the engine and/or warn the user when the Generator overheated or caused excess heat;

    b. failed to manufacture, design, sell, and distribute a Generator that would not overheat or cause a fire;

    c. failed to properly warn that the Generator was prone to overheat, cause excess heat, or cause a fire when used in confined spaces or near combustible materials;

    d. failed to properly warn that no combustible materials should be near the Generator while it was in use;

    e. failed to othe1wise ensure that the Generator would be reasonably safe to operate and would not create any dangerous conditions, foreseeable risks of harm, or unreasonably dangerous or unsafe or defective conditions, including causing a fire; and

    f. was otherwise careless and negligent.

83. The above-described product defects, failure to warn, and negligence were direct and proximate causes of AEDS's, Northland's, C&S's, and ACE's damages, which exceed $75,000 (exclusive of interest and costs).

84. Third-Party Plaintiffs are entitled to recover AEDS's, Northland's, C&S's, and ACE's damages by operation of those parties' assignments of rights to Third-Party Plaintiffs.

85. Because Harbor Freight caused said damages, Harbor Freight should be obligated to fully indemnify Third-Party Plaintiffs, as assignees of the rights of AEDS, Northland, C&S, and ACE, because the fault for the Fire and said damages is the sole fault of Harbor Freight.

SECOND CAUSE OF ACTION:
<u>CONTRIBUTION</u>

86. Paragraphs 1 through 84 are incorporated by reference as though fully set forth at length herein.

87. Because Harbor Freight caused AEDS's, Northland's, C&S's, and ACE's damages, Harbor Freight should be obligated to contribute payment for its share of fault because Third-Party

12

Plaintiffs, as assignees of the rights of AEDS, Northland, C&S, and ACE, would suffer damages if required to bear more than the proportionate share of AEDS's and C&S's liability.

WHEREFORE, Third-Party Plaintiffs respectfully request the following relief:

1. The entry of judgment against Harbor Freight for full indemnity obliging it to pay Third-Party Plaintiffs the damages of AEDS, Northland, C&S, and ACE, including fees and costs;

2. Alternatively, the entry of judgment against Harbor Freight awarding contribution from Harbor Freight in the amount of any payment by AEDS, Northland, C&S, and ACE in excess of their share of liability, including fees and costs; and

3. Plus Third-Party Plaintiffs' other recoverable damages;

4. Plus all allowable pre- and post-judgment interest;

5. Plus all allowable disbursements and costs of this action; and

6. Plus such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Third-Party Plaintiffs hereby demand a jury trial on all issues so triable.

Dated: August 18, 2022

KENNEDY LILLIS SCHMIDT & ENGLISH
Attorneys for Third-Party Plaintiffs

By:   *s/ Nathan T. Williams*
Nathan T. Williams (Admitted *Pro Hac Vice*)
125 Maiden Lane, Suite 5C
New York, New York 10038
(212) 430-0800